**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED NATIONAL INSURANCE
COMPANY, a Pennsylvania
corporation,
              *Plaintiff-Appellee,*

              v.

SPECTRUM WORLDWIDE, INC., a
California corporation; CELEBRITY
PRODUCTS DIRECT, INC., a
California corporation; LISA
TREMAIN, a California citizen;
HOWARD SCHWARTZ, a California
citizen,
              *Defendants-Appellants,*

              and

MONTICELLO INSURANCE COMPANY, a
Delaware corporation,
              *Defendant.*

No. 07-55833

D.C. No.
CV-05-04610-SGL

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen G. Larson, District Judge, Presiding

Argued and Submitted
October 21, 2008—Pasadena, California

Filed February 2, 2009

Before: Harry Pregerson and N. Randy Smith, Circuit
Judges, and Raner C. Collins,* District Judge.

*The Honorable Raner C. Collins, United States District Judge for the
District of Arizona, sitting by designation.

Opinion by Judge N.R. Smith

## COUNSEL

James C. Nielsen, Jennifer S. Cohn, and August L. Lohuaru, Nielsen, Haley & Abbott LLP, Los Angeles, California, for the plaintiffs-appellees.

Peter W. Ross, Gene Williams, and Keith J. Wesley, Brown Woods & George LLP, Los Angeles, California, for the defendants-appellants.

## OPINION

N.R. SMITH, Circuit Judge:

Spectrum Worldwide, Inc. ("Spectrum Worldwide"), Celebrity Products Direct, Inc. and Celebrity Products, Inc. (collectively "Celebrity"), Spectrum Worldwide's president Murray Moss ("Moss"), CEO Lisa Tremain ("Tremain"), and CFO Howard Schwartz ("Schwartz") (all of the defendants hereinafter referred to as "Spectrum") asks this court to determine whether the "first publication" exclusion found in the United National Insurance Company's ("United") excess insurance policy applies to infringement claims. We hold that it does. Additionally, because Spectrum presents us with a legal position that is clearly inconsistent with the position it took and benefitted from in previous litigation, judicial estoppel prevents us from allowing Spectrum to argue that it first published infringing material after purchasing its excess insurance coverage. Further, the district court did not abuse its discretion when it held Schwartz and Tremain jointly and severally liable for repayment of United's contribution.

# I

In December 1997, Sunset Health Products, Inc. ("Sunset") hired Spectrum to advertise and distribute the "Hollywood 48-Hour Miracle Diet" drink ("Miracle Diet"). Soon thereafter, Tremain and Schwartz formed Celebrity to market and sell a similar product, "The Original Hollywood Celebrity Diet" drink ("Celebrity Diet"). Spectrum then terminated its contract with Sunset and began marketing Celebrity Diet.

In December 1998, and again in March 1999, Sunset demanded that Spectrum cease infringing on its Miracle Diet trademark. In October 2001, Sunset filed a trade dress infringement claim against Spectrum, alleging that Spectrum "deliberately" made Celebrity Diet's packaging and labeling so similar to Miracle Diet that it confused consumers and damaged Sunset's reputation (the "*Sunset* Action"). Sunset applied for a temporary restraining order ("TRO"), wherein it asked District Judge Nora Manella[1] to compare Sunset's 1998 label to Spectrum's 1998 and 2001 labels to determine that Spectrum's 2001 label constituted an immediate harm to Sunset. In 1998, Sunset's Miracle Diet label prominently featured the word "Hollywood," contained the phrase "Lose Up To 10 lbs. in 48 Hours!," and included palm trees, gold stars, and Hollywood-style searchlights—all set on a blue/purple background ("Sunset's 1998 label"). Spectrum initially sold Celebrity Diet under a label featuring very similar phrasing, but set against a black background with a large gold star ("Spectrum's 1998 label"). In 1999, Spectrum changed Celebrity Diet's label, sporting the same large gold star and phrasing, but switching to a purple/blue background featuring Hollywood-style searchlights ("Spectrum's 1999 label"). In May 2001, Spectrum again altered Celebrity Diet's label,

---

[1]District Judge Nora M. Manella heard the *Sunset* Action and was originally assigned to hear United's reimbursement claim. However, United's action was transferred to District Judge Stephen G. Larson upon Judge Manella's appointment to the California Court of Appeal.

changing the font and style of the word "Hollywood" to look more like the Hollywood Hills sign, and modified the star and searchlights ("Spectrum's 2001 label").

Judge Manella granted the TRO based on the dramatic change between Spectrum's 1998 and 2001 labels. In the subsequent preliminary injunction hearing, however, Spectrum argued that it changed its 1998 label in 1999, and that its 1999 label was so similar to its 2001 label that Sunset was not in danger of experiencing immediate harm. Judge Manella accepted Spectrum's position, and denied Sunset's preliminary injunction action on this basis. Spectrum therefore continued profiting from the sale of Celebrity Diet, while deepening potential insurers' liability.

In 2001, United also issued Spectrum a one million dollar excess third party liability policy (the "United Policy") related to an underlying policy issued by Monticello Insurance Company (the "Monticello Policy"). United's policy became effective on April 26, 2001, and is "subject to definitions, terms, conditions, exclusions and limitations contained in the [Monticello Policy]," which indemnifies Spectrum for damages resulting from "advertising injury" liability, meaning injury arising from:

    a.   Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;

    b.   Oral or written publication of material that violates a person's right of privacy;

    c.   Misappropriation of advertising ideas or style of doing business;

    d.   Infringement of copyright, title or slogan.

The United Policy does not, however, apply to an "advertising injury . . . arising out of oral or written publication of material whose first publication took place before the beginning of the policy period."

After subsequent hearings on cross-motions for summary judgment in the *Sunset* Action, the parties were left with Sunset's core trade-dress infringement claim. Spectrum and Sunset then settled the *Sunset* Action for a total of $3,220,000 paid to Sunset, funded by Spectrum's insurers. United contributed $420,000 to the settlement, pursuant to its obligations under the United Policy.

United sought reimbursement of its settlement contribution through a Complaint filed against Spectrum on June 24, 2005. United moved for summary judgment, arguing that the United Policy's first publication exclusion eliminated its indemnification obligations. Finding the first publication exclusion generally applicable to infringement claims, the district court nonetheless denied United's motion on September 6, 2006 because "triable issues of fact" prevented the court from determining whether Spectrum's offending actions occurred prior to the United Policy's effective date.

United moved for reconsideration, based on its claim that Sunset's advertising injury had already been determined by Judge Manella in the *Sunset* Action. After reviewing Judge Manella's findings, the district court reconsidered and granted United's motion for summary judgment, holding that Spectrum's 1999 label formed the substance of Sunset's advertising injury, and therefore that the first publication exclusion eliminates United's liability. The district court entered a judgment against Spectrum Worldwide, Schwartz, and Tremain in the amount of $420,000 plus interest. Spectrum moved for reconsideration, arguing first that the district court should not have relied upon Judge Manella's previous findings, and second that Schwartz and Tremain should not have been included in the judgment. The district court denied Spectrum's motion

on May 11, 2007. Spectrum filed a Notice of Appeal on June 6, 2007, and satisfied the judgment.

## II

We review de novo a district court's decision to grant summary judgment. *Thomas v. City of Beaverton*, 379 F.3d 802, 807 (9th Cir. 2004). We do not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue of fact for trial. *See Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999). We may affirm on any basis supported by the record, *Valdez v. Rosenbaum,* 302 F.3d 1039, 1043 (9th Cir. 2002).

## III

Spectrum argues that the United Policy's first publication exclusion does not apply to Sunset's infringement claim, because (1) first publication exclusions do not apply to infringement actions in California and (2) even if the clause applies to infringement actions, summary judgment was not proper to determine whether Spectrum first published infringing material before the United Policy took effect. We find that (1) the United Policy unambiguously applies to infringement actions, and (2) summary judgment is proper to determine the date of first publication in this case, because Spectrum is judicially estopped from presenting and prevailing on inconsistent arguments before the district courts.

## A

[1] Insurance policy interpretation is a question of California law, which requires courts to initially look to the insurance policy language in order to ascertain its plain meaning. Cal. Civ. Code § 1636; *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 627 (Cal. 1995). Because insurance policy interpretation must give effect to the parties' "mutual intention" at the time they formed the contract, Cal. Civ. Code § 1636, the par-

ties' intent should be inferred solely from the written provisions of the contract. Cal. Civ. Code § 1639. The written provisions should be examined "together, so as to give effect to every part, if reasonably practicable." Cal. Civ. Code § 1641. If a written policy provision is "clear and explicit," it must be given proper effect. *E.g.*, *Fireman's Fund Ins. Co. v. Superior Court*, 78 Cal. Rptr. 2d 418, 422 (Cal. Ct. App. 1997).

On the other hand, if a policy provision is capable of two or more reasonable constructions, it is "ambiguous," *Waller*, 900 P.2d at 627 (citing *Bay Cities Paving Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 855 P.2d 1263, 1271 (Cal. 1993)), and courts "must resolve the ambiguity in favor of the insured, consistent with the insured's reasonable expectations," *E.M.M.I. Inc. v. Zurich American Ins. Co.*, 84 P.3d 385, 391 (Cal. 2004) (citation omitted). However, "[c]ourts will not strain to create an ambiguity where none exists." *Waller*, 900 P.2d at 627 (citing *Reserve Ins. Co. v. Pisciotta*, 640 P.2d 764, 768 (Cal. 1982)). In addition, insurance policy exclusions must be "*conspicuous, plain and clear*," otherwise they are "strictly construed" in favor of the insured. *E.M.M.I. Inc.*, 84 P.3d at 389 (citations omitted) (emphasis in original).

**[2]** We find that the United Policy's first publication clause is clear and explicit, and must be given its proper effect. The United Policy's first publication exclusion asserts that "[t]his insurance does not apply to . . . 'advertising injury' . . . (2) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period." The Policy further defines "advertising injury," in relevant part, as "injury arising out of . . . [i]nfringement of copyright, title or slogan." Plainly reading the first publication exclusion and the relevant advertising injury definition together indicates that the parties intended to exclude from coverage any copyright infringement injury that arose from an oral or written publication of material first published before the policy became effective.

United argues that this language unambiguously applies to infringement claims. Spectrum asserts that the language is ambiguous, arguing that because the "advertising injury" definition only uses the word "publication" in sections (a) (slander, libel) and (b) (invasion of privacy), and not in sections (c) defamation and (d) infringement, "it is reasonable to conclude that the first publication exclusion only applie[s] to claims for libel, slander and invasion of privacy because the exclusion explicitly refer[s] to the 'oral or written publication of material.' " *See Arnette Optic Illusions, Inc. v. ITT Hartford Group, Inc.*, 43 F. Supp. 2d 1088 (C.D. Cal. 1998)).[2] Accordingly, Spectrum concludes that because two reasonable interpretations exist (that the exclusion applies to infringement claims, or it does not), the first publication exclusion is ambiguous and must be interpreted in its favor. *See id.* at 1097 (citation omitted).

Spectrum's argument would require us to ignore sections (c) (misappropriation) and (d) (infringement) of the "advertising injury" definition in order to find an ambiguity. That argument contradicts California policy that instructs courts (1) to "give effect to every part, if reasonably practicable," Cal. Civ. Code § 1641, and (2) not to "strain" to find ambiguities. *See*, *e.g.*, *Waller*, 900 P.2d at 627. In order to find Spectrum's interpretation reasonable, we would have to conclude that it is reasonable to ignore Monticello's[3] efforts to carefully define the term "advertising injury" to mean injury arising out of defamation, invasion of privacy, misappropriation, and/or infringement and set the term off in quotation marks throughout the policy. We would also have to conclude that it is rea-

---

[2]In *Arnette*, the district court reviewed a first publication exclusion that was identical to the United Policy exclusion, and found that both interpretations are reasonable. *Arnette*, 43 F. Supp. 2d at 1097. Accordingly, the court concluded that the exclusion was ambiguous. *Id.* Spectrum relies on *Arnette*'s reasoning throughout its argument.

[3]Monticello drafted the United Policy; United referred to the original Monticello policy for its excess coverage policy terms.

sonable to believe Monticello used "advertising injury" to mean injury arising out of defamation, invasion of privacy, misappropriation, and/or infringement in several places throughout the policy, but not in the first publication exclusion, despite no language in the exclusion to that effect. We cannot reasonably make these conclusions while complying with California contract interpretation principles.

**[3]** Moreover, under California law, a split in authority does not necessarily render an exclusion ambiguous. *See*, *e.g.*, *MacKinnon v. Truck Ins. Exchange*, 73 P.3d 1205, 1212 (Cal. 2003) (a policy exclusion "does not become ambiguous merely because the parties disagree about its meaning, or because they can point to conflicting interpretations of the clause by different courts"). Accordingly, based on a plain reading of the insurance policy, we find that the United first publication exclusion is unambiguous and that it clearly applies to infringement claims.

**B**

Because we find that United Policy's first publication exclusion clearly applies to trade dress infringement claims, we must next consider whether the exclusion applies to Sunset's infringement claim. The district court found that "the substance of the advertising injury claimed by Sunset were those elements found on [Spectrum's] January, 1999 label," and thus granted summary judgment that the first publication of infringing material occurred prior to the policy's effective date. The doctrine of judicial estoppel requires that we affirm the district court.

**[4]** The doctrine of judicial estoppel is an equitable doctrine a court may invoke to protect the integrity of the judicial process. *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990). It was developed to prevent litigants from "playing fast and loose" with the courts by taking one position, gaining advantage from that position, then seeking a second advantage by

later taking an incompatible position. *Risetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996) (holding that a plaintiff was judicially estopped from asserting claims based on her ability to work where she had previously received a favorable Workers' Compensation settlement based on assertions that she was unable to work). Judicial estoppel not only bars inconsistent positions taken in the same litigation, but "bar[s] litigants from making incompatible statements in two different cases." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001).

In *New Hampshire v. Maine*, 532 U.S. 742 (2001), the Supreme Court provided a blueprint for determining whether judicial estoppel applies here. First, Spectrum's current position must be "clearly inconsistent" with its earlier position. *Id.* at 750. Second, Spectrum must have succeeded in persuading the district court to accept the earlier position, so that accepting Spectrum's current argument would create "the perception that either the first or the second court was misled." *Id.* Third, we query whether Spectrum would derive an unfair advantage if not estopped. *Id.*

We follow this blueprint to find that judicial estoppel should apply to prevent Spectrum from deriving an unfair advantage by taking its current position. In the 2001 preliminary injunction hearing, Sunset argued that Spectrum's recent label change too closely resembled its trade dress and "motivated the [infringement] lawsuit," though Sunset "claim[ed] to have been aware of [Spectrum's] alleged infringement by December 1998." Spectrum's response focused on Sunset's "delay in seeking injunctive relief," arguing that it had been using the label elements Sunset complained of for almost three years. In essence, Spectrum argued that any alleged infringement began occurring when it adopted its label in January 1999, that any change thereafter was merely incremental shifting of the 1999 label elements, and that the 2001 label did not initially present the harm Sunset asserted—thus prelimi-

nary injunction was not warranted, because Sunset waited nearly three years to bring a claim that arose in 1999.

Spectrum's current argument more closely resembles Sunset's 2001 position—that it was the 2001 label, not the 1999 version, that resulted in the Sunset action, and that the 2001 label constituted distinct infringing material. Moreover, Spectrum argued that if the court granted injunctive relief, it would force them to abandon the label they had spent three years and $4.7 million promoting, further supporting its argument that the trade dress claim dated to 1999. Spectrum's 2001 arguments helped convince Judge Manella that Sunset could not identify any "new or immediate harm that would threaten its livelihood," because Spectrum's 1999 to 2001 label "alterations [were] incremental," and Spectrum's "trade dress ha[d] remained largely consistent since . . . January 1999." In addition, Schwartz's declarations led Judge Manella to conclude that the 1999 label was "remarkably similar" to Sunset's, and thus by waiting to file until 2001, Sunset "waited almost three years after [Spectrum] adopted a similar trade dress to seek injunctive relief." Spectrum relied on these arguments to convince the court that Sunset did not experience new or immediate harm, and thus an injunction was inappropriate. The district court clearly accepted and relied upon these assertions when making its ruling. Accordingly, if we accept Spectrum's current argument that the 2001 label was the basis for Sunset's infringement claim, it may create the perception that Spectrum misled either us or Judge Manella. *See New Hampshire v. Maine*, 532 U.S. at 750.

**[5]** As the discussion set forth above illustrates, Spectrum benefitted from arguing in 2001 that Sunset's alleged infringement claim arose from materials first published in 1999. If we now allow Spectrum to argue that the claim did not arise until 2001, Spectrum's "gaming" of the courts will allow it the possibility of prevailing on the very position it successfully discredited while attempting to avoid preliminary injunction. The result would be unfair to Sunset, whose

alleged harms increased as a result of Spectrum's 1999 arguments. The result would also be unfair to United, whose indemnification obligations increased as Sunset's damages widened after Spectrum successfully avoided an injunction, then later settled.

**[6]** Accordingly, because Spectrum obtained a favorable decision in the district court as a result of its assertions that the alleged infringement first arose in 1999, we find that Spectrum is estopped from claiming before this court that the 2001 label formed the basis of Sunset's claim. We thus affirm the district court in its conclusion that Spectrum first published infringing material in 1999, before the United Policy took effect, and uphold its decision to exclude the Sunset claim from coverage under the Policy.

**IV**

After the district court entered judgment against Tremain and Schwartz, Spectrum filed a motion to reconsider under Federal Rules of Civil Procedure 59(e) and 60(b), arguing that Tremain and Schwartz should not be held personally liable for reimbursing United. The district court rejected this argument; Spectrum argues that this was an error. Because Spectrum first raised this issue in its motion for reconsideration, we only address the argument within that context.

A denial of a motion for reconsideration under Rule 59(e) is construed as one denying relief under Rule 60(b) and neither will be reversed absent an abuse of discretion. *Duarte v. Bardales*, 526 F.3d 563, 567 (9th Cir. 2008) (citations omitted). Under Rule 59(e), it is appropriate to alter or amend a judgment if "(1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law." *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001).

Rule 60(b) allows a district judge to provide relief from a final judgment if the moving party can show

> (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud . . . , misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Fed. R. Civ. Pro. 60(b).

**[7]** Spectrum did not present any evidence that would allow the district court to grant relief from a final judgment under Rule 60(b). Neither did Spectrum present new evidence, nor did controlling law change in the interim. The district court rejected Spectrum's contention that holding Tremain and Schwartz individually liable was unjust, concluding that since "United raised the issue of [Tremain's and Schwartz's] liability in its motion for summary judgment," and Spectrum did not "interpose[ ] an argument against that claim," Spectrum could not raise it post-judgment. Because "[a] district court does not abuse its discretion when it disregards legal arguments made for the first time" on a motion to alter or amend a judgment, *Zimmerman*, 255 F.3d at 740 (*citing Rosenfeld v. U.S. Department of Justice*, 57 F.3d 803, 811 (9th Cir. 1995)), we affirm the district court with respect to this issue.

## V

In sum, we hold that the district court properly granted summary judgment to United on the issues of whether the United Policy's first publication exclusion applies to trade

dress infringement claims, and whether Sunset's claim arose from information first published prior to the Policy's effective date. Additionally, we hold that the district court did not abuse its discretion when it held Tremain and Schwartz individually liable for the judgment.

**AFFIRMED.**