[No. B208699. Second Dist., Div. Five. Nov. 13, 2009.]

KIM SENG COMPANY, Cross-complainant, Cross-defendant and Appellant, v.
GREAT AMERICAN INSURANCE COMPANY OF NEW YORK et al., Cross-defendants, Cross-complainants and Respondents.

COUNSEL

Law Offices of Mark L. Sutton and Mark L. Sutton for Cross-complainant, Cross-defendant and Appellant.

Musick, Peeler & Garrett, Cheryl A. Orr, David A. Tartaglio; Bates & Carey, Richard H. Nicolaides, Jr., Jonathan T. Viner, Daniel I. Graham, Jr., and Agelo L. Reppas, for Cross-defendants, Cross-complainants and Respondents.

OPINION

MOSK, J.—

## INTRODUCTION

The insurers and the insured dispute whether the insurers providing advertising injury coverage had a duty to defend the insured in a trademark infringement action and to indemnify the insured in connection with that action. The trial court granted summary judgment in favor of the insurers based on the prior publication exclusion in the applicable policies.

On appeal, the insured asserts that the insurers had a duty to defend it in the underlying trademark infringement action because of the possibility that the prior publication exclusion did not apply based on the following theories:

(i) the prior publication exclusion does not apply to a trademark infringement but rather is limited to libel, slander, and invasion of privacy claims; (ii) the word "material" used in the policy definition of "advertising injury" renders the prior publication exclusion inapplicable to the trademark infringement claims in this case; and (iii) the prior publication exclusion does not apply because the trademarked words in question used prior to the policy period were used with different words and a new logo during the term of the policy. We hold that the prior publication exclusion applies to the trademark infringement claims in this case.

## BACKGROUND

### A.  *Underlying Action*

In 2005, Derek and Constance Lee Corporation doing business as Great River Food (Great River), an Asian food wholesaler, sued Kim Seng Company (Kim Seng), another Asian food wholesaler, for, inter alia, trademark violations. The action, which had been commenced in the Los Angeles Superior Court, was removed to the United States District Court for the Central District of California. Great River alleged that Kim Seng's use of the term "Que Huong" (Vietnamese for "hometown," "native land," "country" or "fatherland") on food products infringed the Great River trademark, "Que Huong," that Great River used for its Vietnamese-style frozen meats.

In 1997, Kim Seng had registered the trademark "Que Huong" for rice noodles, rice sticks, sauces, and fish sauces in the United States Patent and Trademark Office (USPTO).[1] In the trademark application, Kim Seng's president stated Kim Seng had used the mark in interstate commerce at least as early as March 1993. In 2000, Kim Seng had registered with the USPTO a bearded farmer logo trademark "Old Man Que Huong Brand" for rice noodles, rice sticks, and vermicelli. Kim Seng's president stated in that application that Kim Seng had used the mark in interstate commerce at least as early as January 1988. During the period between October 6, 1997, and October 6, 1998—the relevant period of the insurance policies—Kim Seng commenced using the trademarks "Bun Tuoi Hieu Que Huong Brand," "Bun

---

[1] A trademark is defined by the relevant federal statute (15 U.S.C. § 1127) as "any word, name, symbol, or device, or any combination thereof . . . [¶] (1) used by a person, or [¶] (2) which a person has a bona fide intention to use in commerce and applies to register on the principal register . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." The owner of a trademark "may request registration of its trademark" on the "principal register . . . in the Patent and Trademark Office" (15 U.S.C. § 1051(a)(1)), and such registration is prima facie evidence of the registrant's ownership of the mark. (15 U.S.C. §§ 1057(b), 1115(a).)

Que Huong Dac Biet," and a trademarked logo that included a water buffalo and the words "Que Huong."

Great River alleged that it had been manufacturing and distributing Asian food products under the "Que Huong" trademark since 1986, and that Kim Seng infringed its trademark "Que Huong" (registered by its predecessor in the USPTO in 1997) by Kim Seng's use of the "Que Huong" and "Old Man Que Huong Brand" marks. Great River sought, inter alia, to enjoin the use by Kim Seng of "Que Huong" or any confusingly similar mark.[2] The jury found that Kim Seng did not infringe Great River's trademark with respect to Kim Seng's "Old Man Que Huong Brand" trademark but that Kim Seng's "Que Huong" only trademark did constitute an infringement of Great River's trademark. The jury also found that Great River suffered no damages and that Kim Seng did not willfully infringe any trademark. The United States District Court judge granted Great River's motion for a permanent injunction, enjoining use of the term "Que Huong" in connection with Asian food products sold, distributed, or advertised in the United States. Both parties appealed, and the appeal is still pending in the Ninth Circuit Court of Appeals.[3]

B. *Coverage Action*

Great American Insurance Company of New York (formerly known as American National Fire Insurance Company) insured Kim Seng under a primary commercial liability policy, effective October 6, 1997, through October 6, 1998. The policy covers "advertising injury" and provides per occurrence and general aggregate limits of $1 million each. American Alliance Insurance Company (now Great American Alliance Insurance Company) issued an umbrella policy also insuring Kim Seng under a commercial liability policy, effective April 14, 1998, through October 6, 1998, that covers "advertising injury" and provides per occurrence and general aggregate limits of $1 million each over a defined limit. The umbrella policy's schedule of underlying insurance includes the primary commercial liability policy. (The insurers, related companies, are collectively referred to as Great American.)

---

[2] An infringement of a trademark is defined as an act committed by any person who, without the consent of the registrant shall: "(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or [¶] (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." (15 U.S.C. § 1114(1).)

[3] We grant respondents' motion to take judicial notice of documents reflecting the parties' appeal in the United States District Court action.

The primary policy advertising injury coverage provides: "We will pay those sums that the Insured becomes legally obligated to pay as damages because of . . . 'advertising injury' to which this insurance applies." The policy defines "advertising injury" as follows:

"1. 'Advertising injury' means injury arising out of one or more of the following offenses:

"a. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

"b. oral or written publication of material that violates a person's right of privacy;

"c. misappropriation of advertising ideas or style of doing business; or

"d. infringement of copyright, title or slogan."

The umbrella policy states, "We will pay on behalf of the 'Insured' those sums in excess of the 'Retained Limit' that the 'Insured' becomes legally obligated to pay by reason of liability imposed by law or assumed by the 'Insured' under an 'insured contract' because of . . . 'advertising injury' that takes place during the Policy Period and is caused by an 'occurrence' happening anywhere."

The umbrella policy defines "advertising injury" as follows:

"A. 'Advertising injury' means injury arising solely out of advertising activities of any 'Insured' as a result of one or more of the following offenses during the policy period:

"1. oral, written, televised, videotaped, or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

"2. oral, written, televised, videotaped, or electronic publication of material that violates a person's right of privacy;

"3. misappropriation of advertising ideas or style of doing business;

"4. infringement of copyright, title or slogan; or

"5. mental injury, mental anguish, humiliation, or shock, if directly resulting from Items A.1 through A.4."

The primary policy's "advertising injury" coverage is subject to the prior publication exclusion, which excludes coverage for advertising injuries arising from material first published before inception of the policy.

The policy states:

"a. . . . 'advertising injury': [¶] . . . [¶]

"(2) arising out of oral or written publication of material whose first publication took place before the beginning of the policy period."

The umbrella policy contains the same prior publication exclusion.

"J. . . . 'advertising injury': [¶] . . . [¶]

"(2) arising out of oral, written, televised, videotaped, or electronic publication of material whose first publication took place before the beginning of the policy period."

Peerless Insurance Company (Peerless) (through Golden Eagle Insurance Company) and Truck Insurance Exchange paid for Kim Seng's defense through posttrial proceedings in Great River's underlying trademark infringement action. Peerless notified Great American of the underlying action. Great American denied coverage based on the prior publication exclusion and refused to defend the action.

Peerless brought an action for equitable contribution and subrogation against Great American and other insurers concerning the failure to pay defense and indemnity costs Peerless incurred on behalf of Kim Seng in the Great River's underlying trademark infringement action. While disputing liability, Truck Insurance Exchange also sought equitable contribution and equitable subrogation against other insurers in the event it is found liable. Kim Seng and Great American cross-claimed against each other for a declaratory judgment as to whether the policies created a duty to defend and indemnify Kim Seng in connection with the underlying trademark infringement action. Kim Seng moved for summary adjudication against all insurers on the duty to defend and indemnity issues, claiming that the prior publication exclusion is inapplicable. Great American moved for summary judgment asserting it had no duty to defend or indemnify. The trial court granted Great American's motion, concluding that the Great American policies' prior

publication exclusions "clearly excluded" coverage. Kim Seng timely appealed the summary judgment in favor of Great American.

## DISCUSSION

### A. *Applicable Legal Principles and Standard of Review*

■ The California Supreme Court has stated, "If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first instance." (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 655 [31 Cal.Rptr.3d 147, 115 P.3d 460].)

■ If a policy provision is ambiguous, we resolve the ambiguity in the insured's favor, consistent with the insured's reasonable expectations. (*Davis v. Farmers Ins. Group* (2005) 134 Cal.App.4th 100, 104 [35 Cal.Rptr.3d 738].) Nevertheless, "it is settled that a potential for coverage cannot be based on an unresolved legal dispute concerning policy interpretation which is ultimately resolved in favor of the insurer." (*Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group* (1996) 50 Cal.App.4th 548, 556 [59 Cal.Rptr.2d 36] (*Lebas*).)

In determining whether " 'a particular policy provides a potential for coverage' " and therefore a duty to defend, " 'we are guided by the principle that interpretation of an insurance policy is a question of law. [Citation.]' [Citation.]" (*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 414 [33 Cal.Rptr.3d 583, 118 P.3d 607].) Moreover, in considering a summary judgment concerning the duty of an insurer to defend the insured in an action, we conduct a de novo review. (*Cunningham v. Universal Underwriters* (2002) 98 Cal.App.4th 1141, 1148 [120 Cal.Rptr.2d 162].)

### B. *Policy Coverage*

■ Under the policies, "advertising injury" includes "misappropriation of advertising ideas or style of doing business" or "infringement of copyright, title or slogan." In *Lebas, supra,* 50 Cal.App.4th at page 565, the court in interpreting a clause identical to that in the instant case, held that notwithstanding any ambiguity, "[w]hen read in light of the fact that a trademark

infringement could reasonably be considered as one example of *a* misappropriation, and taking into account that a trademark could reasonably be considered to be part of either an advertising idea or a style of doing business, it would appear objectively reasonable that 'advertising injury' coverage could now extend to the infringement of a trademark." (See Milone & McGuinness, *Insurance Coverage for Trademark Infringement Lawsuits* (2009) 8 Ins. Coverage L. Bull. 9 ["A majority of courts have held that the standard definition of 'advertising injury' contained in standard comprehensive general liability policies covers trademark infringement claims."].) Accordingly, unless an exclusion applies, the policies would cover the injury here.

### C. *Prior Publication Exclusion*

The prior publication exclusion in the policies bars coverage for advertising injury that arises out "of oral or written publication of material whose first publication took place before the beginning of the policy period."

### 1. *Application of Exclusion to Trademark Infringement*

Kim Seng contends that the exclusion clause only applies to libel, slander and invasion of privacy and not to trademark infringement. In the primary policy, "advertising injury" applies to four subparts. The first two are "(a) *oral or written publication* of material that slanders or libels . . ." and "(b) *oral or written publication* of material that violates a person's right of privacy." (Italics added.) But the third, "(c)," covers "misappropriation of advertising ideas or style of doing business" and the fourth, "(d)," covers "infringement of copyright, title or slogan." (The umbrella policy has similar language.) The latter two subparts implicate trademark violations. The exclusion in the policies applies to advertising "arising out of *oral or written publication* of material whose first publication took place before the beginning of the policy period." (Italics added.) Kim Seng's argument is that because the exclusion uses the words "oral or written publication," it only refers to injuries arising from an "oral or written publication" that constitutes defamation or violation of the right of privacy. Courts have come to different conclusions on this issue. (Compare *Irons Home Builders, Inc. v. Auto-Owners Ins. Co.* (E.D.Mich. 1993) 839 F.Supp. 1260, 1264 (*Irons Home Builders*) [the language of the exclusion "mimics the provisions of the policy that relate to advertising injury involving libel, slander, and invasion of privacy" and limits the scope of the exclusion to those actions]; *Adolfo House Distributing Corp. v. Travelers Property and Casualty Ins. Co.* (S.D.Fla. 2001) 165 F.Supp.2d 1332 [followed *Irons Home Builders*]; *Arnette Optic Illusions, Inc. v. ITT Hartford Group, Inc.* (C.D.Cal. 1998) 43 F.Supp.2d 1088, disapproved by *United National Ins. Co. v. Spectrum Worldwide, Inc.* (9th Cir. 2009) 555 F.3d 772 (*Spectrum*) with *Spectrum, supra*, 555 F.3d 772 [policy

interpretation is a question of California law, and the exclusion language that was identical to that in the instant case clearly and explicitly applies to a trademark infringement action]; *Applied Bolting Technology Products, Inc. v. U.S. Fidelity & Guaranty Co.* (E.D.Pa. 1996) 942 F.Supp. 1029, 1037 (*Applied Bolting*) ["the first-publication exclusion must be read to apply to the entire definition of 'advertising injury . . .' "]; *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.* (S.D.Tex. 2000) 203 F.Supp.2d 704 [followed *Applied Bolting*]; see also *Cincinnati Ins. Cos. v. Pestco, Inc.* (W.D.Pa. 2004) 374 F.Supp.2d 451 [language at least is ambiguous such that it should be interpreted against the insurer and in favor of coverage].)

We believe the exclusion does apply to trademark infringement actions and is not limited to defamation and right of privacy actions. In the policies, the term "advertising injury" is surrounded by quotation marks, and it appears with quotation marks in the prior publication exclusion. Four, not two, actionable elements are expressly set forth in the policy to define "advertising injury." The prior publication exclusion bars coverage for " 'advertising injury' . . . [¶] . . . [¶] . . . arising out of oral or written publication of material whose first publication took place before the beginning of the policy period." This exclusion means that "advertising injury" has the same four-subpart meaning when used in the exclusion that it has every other time it appears in the policy enclosed in quotation marks. The exclusion should be read to give effect to the plain meaning of "advertising injury."

■ That some of the language in the exclusion happens to match some of the words in subparts (a) and (b) of the definition of "advertising injury" but not match some of the language in subparts (c) and (d) does not appear to be of any significance. Accordingly, the prior publication exclusions apply to all of the actionable conduct listed in the four-subpart definition of "advertising injury," which would include trademark infringements. Just because there is a split of authority on this issue does not create an ambiguity or a potential of coverage that requires a duty to defend. (See *Spectrum, supra*, 555 F.3d at p. 778; *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647 [3 Cal.Rptr.3d 228, 73 P.3d 1205]; *ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1787–1788, fn. 39 [22 Cal.Rptr.2d 206]; *Lebas, supra*, 50 Cal.App.4th at p. 556.)

### 2. *"Material" in the Exclusion*

Kim Seng argues that the word "material" used in the prior publication exclusion means something tangible such as packaging. According to Kim Seng, the prior publication exclusion refers to a prior publication of the same advertising "material"—i.e. the same packaging or label—containing a particular trademark; it does not refer to a prior publication of the same "right"

or trademark. Thus, Kim Seng argues that even if the trademark in question was first used on different packaging before the policy period, the packaging or "material" changed during the policy period. Thus, there was no prior publication of the new "material."

Although the policy does not define "material," there is nothing to suggest that "material" requires a tangible object, such as packaging, and that the exclusion is limited to a "trade dress" claim. (See *Aloha Pacific, Inc. v. California Ins. Guarantee Assn.* (2000) 79 Cal.App.4th 297, 319–320 [93 Cal.Rptr.2d 148] ["trade dress" involves " 'appearance or image of goods or services as offered for sale in the marketplace . . . [and] includes the appearance of labels, wrappers, and containers used in packaging a product' "].) As we have discussed, advertising coverage includes trademark infringement actions. It is the infringing trademark that is the "material" covered by the prior publication exclusion. It would make no sense for the exclusion to apply only to the specific packaging or label and not to the infringing trademark that is the subject of the underlying action.

### 3. *Marks Used Before and During the Policy Period to Determine Prior Publication*

Kim Seng notes that Great River's pleadings in the underlying action identified only two Kim Seng trademarks—the "Old Man Que Huong Brand" mark and the "Que Huong" mark by itself. Kim Seng then argues that the underlying action sought to enjoin certain marks initiated during the policy period ("Bun Tuoi Hieu Que Huong Brand," "Bun Que Huong Dac Biet," and the water buffalo design mark consisting of the words "Que Huong" and any other mark confusingly similar to Great River's marks) that differ in substance from the marks used prior to the policy. Thus, according to plaintiff, "Que Huong" marks adopted during the policy period having words or logos different from those "Que Huong" marks used prior to the policy periods are not subject to the prior publication exclusion. Kim Seng points out that the jury in the underlying case found that the "Old Man Que Huong Brand" did not constitute an infringement, even though it included the words "Que Huong," that did infringe.[4]

In *Taco Bell Corp. v. Continental Casualty Co.* (7th Cir. 2004) 388 F.3d 1069 (*Taco Bell*), an agency developed a marketing concept called " 'Psycho Chihuahua' " involving " 'the image of a clever, feisty Chihuahua dog with an attitude' " and proposed to Taco Bell an advertising campaign based on the Chihuahua obsessed with Taco Bell food. (*Id.* at p. 1072.) Thereafter, without obtaining permission from the agency, Taco Bell began an advertising

---

[4] As noted, the underlying action is on appeal.

campaign with the theme of a Chihuahua obsessed with Taco Bell food. (*Ibid.*) The agency sued for misappropriation. (*Ibid.*) Taco Bell's insurer invoked the prior publication exclusion because the first Chihuahua ads ran prior to the policy period. (*Ibid.*)

The court in *Taco Bell, supra*, 388 F.3d at pages 1072–1073, discussed the purpose and application of the prior publication exclusion for advertising injury insurance coverage. Writing for the court in that case, Judge Posner explained that the prior publication exclusion "bar[s] coverage because the wrongful behavior had begun prior to the effective date of the insurance policy. The purpose of insurance is to spread risk—such as the risk that an advertising campaign might be deemed tortious—and if the risk has already materialized, what is there to insure? . . . [¶] . . . [¶] At some point a difference between the republished version of an unlawful work and the original version would be so slight as to be immaterial [citing, inter alia, *Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165 [96 Cal.Rptr.2d 136]]. But that observation cannot save the insurer when the republication contains new matter that the plaintiff in the liability suit against the insured alleges as fresh wrongs." The court held the prior publication exclusion did not relieve an insurer from its duty to defend against claims that Taco Bell had misappropriated the advertising program of a " 'Psycho Chihuahua,' " even though the advertising campaign had commenced prior to the policy period. Because the underlying complaint alleged that subsequent commercials were sufficiently distinct from the earlier ones and occurred during the insurer's policy period, the insurer was obligated to defend the insured.

The court in *Taco Bell, supra*, 388 F.3d at page 1073, suggested that if copyrighted material was later republished as part of a larger work, the prior publication exclusion would apply. But in *Taco Bell*, the alleged infringer used an idea. The court said, "The charge of misappropriation of the idea of the Chihuahua's head popping out of a hole is a *claim* of advertising injury, meritorious or not; and Taco Bell bought insurance against having to pay the entire expense of defending against such claims." (*Ibid.*) In *Taco Bell*, the advertisements during the policy period were different from those that ran prior to the period, even though the general subject matter was similar.

The court in *Ringler Associates Inc. v. Maryland Casualty Co., supra*, 80 Cal.App.4th 1165 (*Ringler*) attempted to set forth a test of the relationship between publications prior to the insurance policy and during the policy period in determining whether the prior publication exclusion applies to the publications during the policy period. The plaintiff sought indemnification from an insurer for claims in the underlying defamation action against the plaintiff for publications concerning the underlying plaintiff's professional

practices. The court said that "the first-publication exclusion language at issue is intended to and in fact bars coverage of an insured's continuous or repeated publication of *substantially the same* offending material previously published at a point of time before a policy incepts, while *not* barring coverage of offensive publications made during the policy period which *differ in substance* from those published before commencement of coverage." (*Id.* at p. 1183.) The court further said, "It is not a particularly onerous matter to identify and distinguish one libel or slander from another, based on the *substance* of the disparagement and the nature of the defamatory assertions made. On the other hand, by limiting the scope of the exclusion to verbatim replications of the precise same words and phrases, [the plaintiff's] interpretation would effectively render the exclusion meaningless." (*Id.* at p. 1182.)

Great American contends that the claim against Kim Seng was for trademark infringement based on use of the words "Que Huong" prior to the policy period. Kim Seng continued to use that term in various iterations thereafter. According to Great American, Kim Seng's use of those words during the policy period, just as the defamatory language in *Ringler, supra*, 80 Cal.App.4th 1165, constituted a republication of the prior publication of the "Que Huong" mark, and therefore the prior publication exclusion should apply.

We agree with Great American. The underlying action focused on the use of a trademark, "Que Huong." Great River did not allege an infringement based on Kim Seng's use of any other words or images. Great River alleged in the underlying action infringement by *any* Kim Seng trademark using the words "Que Huong" as part of a trademark that was confusingly similar to Great River's Que Huong mark. Great River has no claim as to any words other than "Que Huong." Even with the addition of descriptive words and logos, the use of the term "Que Huong" still suggests that the Kim Seng product is from the same source as products bearing the original "Que Huong" mark-the Great River product. The use of "Que Huong" words is not just substantially similar to the allegedly offending mark used prior to the policy period, but identical to that mark. The words added by Kim Seng to "Que Huong" during the policy period are merely product description. "Bun Tuoi Hieu Que Huong Brand" means "fresh vermicelli Que Huong Brand" and "Bun Que Huong Dac Biet" means "special vermicelli Que Huong Brand." The water buffalo design mark includes the "Que Huong" words alone.

In *Taco Bell, supra*, 388 F.3d 1069, the advertisements in issue within the policy period contained a depiction that was different from those that preceded the policy period—"new matter that the plaintiff in the liability suit against the insured alleges as fresh wrongs." (*Id.* at p. 1073.) Thus, the

advertisements during the policy period were not covered by the prior publication exclusion. Unlike in *Taco Bell*, the Kim Seng additions to "Que Huong" during the policy period did not give rise to "fresh wrongs." The alleged wrongs before and during the policy period were the use of the words "Que Huong." Whether one examines the pleadings in the underlying action or extrinsic evidence, Great River only claimed that the use of the words "Que Huong" constituted an infringement.

In *Ringler, supra*, 80 Cal.App.4th 1165, the defamatory statements during the policy period were restatements of defamatory statements that preceded the policy period, even if the words were not identical. Under those circumstances, the prior publication exclusion applied. Here, the claimed offending words in issue in the underlying action both before and during the policy period are identical. The additions of words or logos do not change the fact that the claim is for the use of the words "Que Huong." That alleged infringement preceded the policy periods.

■ Kim Seng suggests that the "likelihood of confusion" standard used to determine whether there is a trademark infringement (see *Schwartz v. Slenderella Systems of Calif.* (1954) 43 Cal.2d 107, 112–113 [271 P.2d 857]; *Mallard Creek Industries, Inc. v. Morgan* (1997) 56 Cal.App.4th 426, 434–435 [65 Cal.Rptr.2d 461]) should be used to determine the existence of the prior publication exclusion. But the test for the prior publication exclusion is whether the claimed actionable language or mark used during the policy period is substantially similar to the language or mark used prior to the policy period. We do not deal with whether there was an infringement, but rather whether there is coverage.

■ Kim Seng argues that the court in *Ringler, supra*, 80 Cal.App.4th at page 1183, used the term "substantially the same," and therefore the test "substantially similar" is not appropriate here. Both terms in this context have the same meaning. (Cf. *McDonald v. Department of Motor Vehicles* (2000) 77 Cal.App.4th 677, 680 [91 Cal.Rptr.2d 826] [referring to the statutory term "substantially the same" in Veh. Code, § 13363, subd. (b) as requiring a "substantially similar determination"]; see *Watson v. Fair Political Practices Com.* (1990) 217 Cal.App.3d 1059, 1085 [266 Cal.Rptr. 408] [setting forth the then existing version of a Fair Political Practice Commission regulation that "[p]ieces of mail are 'substantially similar' if their text is substantially the same"].) Sameness would seem to be absolute. There are no degrees of sameness. Just like the word "unique," which is said not to be "gradable." (See Burchfield, The New Fowler's Modern English Usage (rev. 3d ed. 1998) p. 809 ["It must, I think, be conceded that *unique* is losing its quality of being 'not gradable' (or absolute), but copy editors are still advised to query such uses while the controversy about its acceptability continues"]; Garner, A

Dictionary of Modern Legal Usage (2d ed. 2001) p. 900 ["to write *very unique, quite unique, how unique*, and the like is slovenly"].)

The phrases "substantially similar,"[5] "substantially the same" (*Ringler, supra*, 80 Cal.App.4th at p. 1183) or "so slight as to be immaterial" (*Taco Bell, supra*, 388 F.3d at p. 1073), as the tests applicable here, are indistinguishable. They all mean, in effect, that a "fresh wrong" for coverage purposes has not occurred. (*Ibid.*)

The underlying action involved a claim against the use of the words "Que Huong," which use preceded the insurance policies. The purpose of the prior publication exclusion is to preclude coverage for risks that have already materialized, such as occurred here. Accordingly, the exclusion applies in this case.

## DISPOSITION

The judgment is affirmed. Great American Insurance Company of New York and Great American Alliance Insurance Company are awarded their costs on appeal.

Armstrong, Acting P. J., and Kriegler, J., concurred.

A petition for a rehearing was denied December 7, 2009, and the opinion was modified to read as printed above.

---

[5] Kim Seng notes that "substantially similar" is a term used in copyright cases (see *Jada Toys, Inc. v. Mattel, Inc.* (9th Cir. 2008) 518 F.3d 628, 636–637), but it is also used in many other contexts. (See, e.g., Health & Saf. Code, § 11401, subd. (b)(1) [definition of controlled substance analog]; Gov. Code, § 82041.5 [definition of "mass mailing" in Political Reform Act]; *Pacific Merchant Shipping Assn. v. Voss* (1995) 12 Cal.4th 503, 523 [48 Cal.Rptr.2d 582, 907 P.2d 430] [referring to use in tax context]; *Kurlan v. Columbia Broadcasting Systems* (1953) 40 Cal.2d 799 [256 P.2d 962] [plagiarism]; *Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th 281 [61 Cal.Rptr.3d 243] [in connection with damages for lost profits]; *Fire Ins. Exchange v. Superior Court* (2004) 116 Cal.App.4th 446 [10 Cal.Rptr.3d 617] [insurance coverage forms]; *People v. Silver* (1991) 230 Cal.App.3d 389 [281 Cal.Rptr. 354] [term in Health & Saf. Code not unconstitutionally vague]; *Sutton v. Walt Disney Productions* (1953) 118 Cal.App.2d 598 [258 P.2d 519] [breach of implied and express contracts regarding literary property].)